UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
TYSON THOMPSON,                           )
                                          )
              Plaintiff,                   )
                                          )
v.                                        )         Civil Action No. 10-11742-JLT
                                          )
MICHAEL ASTRUE,                           )
                                          )
              Defendant.                   )
_____)


REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM
DECISION BY COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION


February 17, 2012

SOROKIN, M.J.


        The Plaintiff, Tyson Thompson, moves pursuant to 42 U.S.C. § 405(g) for an order

reversing an unfavorable decision by the Defendant Michael Astrue, Commissioner of the Social

Security Administration, denying his claim for Supplemental Security Income ("SSI").  Docket #

13.  The Commissioner moves for an order affirming his decision.  Docket # 22.  For the

following reasons, I RECOMMEND that Thompson's motion (Docket # 13) be DENIED and

that the Defendant's motion (Docket # 22) be ALLOWED.

I.      FACTUAL AND PROCEDURAL HISTORY

        Thompson was born in 1973.  Docket #13 at 3.  He attended school up to the eleventh

grade in "special needs classes for learning disabled for all subjects."[1]  Tr. at 29, 112; Docket #

13 at 3.  He worked as a laborer for the City of Fall River's Department of Public Works from

1995-1997, and was incarcerated at various times between 1997-2000 and 2002-2006.  Tr. at 21,

31; Docket # 13 at 3.

Thompson's Medical History

On September 20, 2002, Dr. Kennard Kobrin completed an Emergency Aid to the

Elderly, Disabled and Children Medical Report concerning Thompson for the Department of

Transitional Assistance, and attached office records dated June 2, 2001, through September 19,

2002.  Tr. at 297-307.  Dr. Kobrin listed a primary diagnosis of "Explosive Personality," with

supporting symptoms of aggression and avoidance.  Tr. at 300.  He noted marked limitations in

each of the categories considered (namely: remembering and carrying out simple instructions;

maintaining attention and concentration in order to complete tasks in a timely manner; making

simple work-related decisions; interacting appropriately with co-workers and supervisors;

working at a consistent pace without extraordinary supervision; and, responding appropriately to

changes in work routine or environment).  Id. at 300, 302.

In July 2001, Thompson had undergone a "Comprehensive Diagnostic Psychological

Evaluation" by Leonard Bard, Ph.D., both at Dr. Kobrin's request and for the purpose of

determining financial assistance through the Public Welfare Department.  Dr. Bard's diagnoses

were Antisocial Personality Disorder with Avoidant and Borderline Features, Polysubstance

Abuse, and Adjustment Disorder with Mixed Emotional Features.  Id. at 185-192.  In particular,

---

[1] Dr. Herbert Rothfarb, Thompson's treating psychologist, noted that the claimant was in
"Special Needs Education from the first to the eighth grade."  Tr. at 169.

Dr. Bard noted that Thompson's responses to the MCMI (a self-report objective personality inventory):

> made the results of this test invalid as he endorsed all four of the validity items, an extremely unusual occurrence. The hypothesis that appears to be most likely is that Mr. Thompson simply got tired of reading each of the test items before responding and either became careless or began to respond randomly. This would be consistent with his impatience on simpler tasks as well as consistent with his overall personality functioning. In any event his inability or unwillingness to follow the test instructions is certainly diagnostic and will be incorporated into the overall picture described below."

Tr. at 191.

Dr. Bard ultimately concluded that Thompson "experiences marked restrictions in his activities of daily living and marked difficulties in maintaining appropriate social functioning." Tr. at 192. He also found evidence of "deficiencies in areas of concentration and persistence that result in a frequent failure to complete tasks in a timely manner. Thus, it is my opinion that Tyson Thompson currently meets the criteria for disability as the result of a mental disorder." Id.

Thompson visited Dr. Herbert Rothfarb for a psychological evaluation on February 10, 2004, at the request of the local welfare office. Docket #13 at 3; Tr. at 169-73; 271-88. Dr. Rothfarb observed Thompson's "severely-bitten fingernails," noted that Thompson did not "offer information beyond that asked of him," could not spell, and had "notable reading deficits." Tr. at 169. Dr. Rothfarb also observed "an absence of brightening affect," and noted that Thompson has been "chronically depressed." Tr. at 170. Dr. Rothfarb diagnosed Thompson with recurrent major depressive disorder, opioid dependence (full remission), a learning disorder, antisocial personality disorder and mild mental retardation. Tr. at 172. In terms of residual functional capacity, Dr. Rothfarb stated that Thompson "scored overall at the Mild Mental Retarded level of intellectual function." Tr. 170, 172. He found that Thompson was

"able to understand, remember and carry out only very short and simple instructions. He was defective in concentration and arithmetic reasoning . . . is unable to interact appropriate with the general public. His ability to ask simple questions/request assistance is variable . . . He would have difficulty to maintain socially appropriate behavior over time. He cannot presently complete a normal work day without being interrupted by symptoms, nor could he work in coordination with or in close proximity to others without being distracted by them. He would have difficulty to understand and remember locations and work-related procedures unless they were tailor made for him. He would not be able to get along with co-workers."

Tr. at 172.

Further, Dr. Rothfarb found that Thompson demonstrated "marked restrictions of activities [of] daily living" and "marked difficulties in maintaining effective and appropriate social functioning." Tr. at 172, 173. Dr. Rothfarb also treated Thompson at various points between 2004 and 2009. Tr. 316.

On December 4, 2006, Dr. Cornelius Neil Kiley (a nonexamining state agency medical consultant) opined that the records contained insufficient evidence to complete a psychiatric review technique form. Docket #23 at 3; Tr. at 174.

On July 5, 2007, Thompson was evaluated by Dr. Vladimir Yufit for a consultative exam. Dr. Yufit noted that Thompson complained of depression and anxiety and stated that he did not like to be around people and spent most of his day watching television. Tr. at 198. Thompson reported to Yufit that he was not taking any medication for these conditions. Id. Dr. Yufit found Thompson to be alert, with flat affect and "very poor eye contact," and reported his impressions of "allergic depression and anxiety. The patient interview does not indicate any significant depression." Tr. at 200.

On July 12, 2007, Thompson was evaluated by Dr. Mark Daniel Sokol for a consultative exam. Tr. at 216-20. Dr. Sokol reported that Thompson was "uncooperative and evasive

4

throughout the examination" and "denie[d] any depressive symptoms." <u>Tr.</u> at 217.  Dr. Sokol

administered a Wechsler Memory Scale test, which had to be discontinued and could not be

scored.  <u>Tr.</u> at 218.  A Rey Test of Malingering was then administered, revealing a score of 3/15,

which Dr. Sokol opined "support[ed] [his] assumption that [Thompson's] performance was not

effortful."  <u>Tr.</u> at 218-19.  Dr. Sokol concluded that Thompson's intellectual functioning

appeared to be in the average-to-low-average range.  <u>Tr.</u> at 219.  In diagnosing Thompson, Dr.

Sokol noted at Axis I, "Rule out malingering;" Axes II-IV had the notation "Deferred" and Axis

V stated "Deferred due to insufficient information."  <u>Id.</u>

On August 6, 2007, Dr. Jane Metcalf, also a nonexamining state agency medical

consultant, opined that the records contained insufficient evidence to complete a psychiatric

review technique form.  <u>Tr.</u> at 223.  She noted, however, that at the July, 2007 consultative exam

with Dr. Sokol, Thompson had been uncooperative, had grossly intact cognitive skills, and had

scored within the malingering range on a rating scale, all calling into question the validity of the

prior evaluation with Dr. Rothfarb in which Thompson was seen to be depressed, with limited

cognitive skills.  <u>Tr.</u> at 235.  Dr. Metcalf also noted, "[t]here are no current treaters to sort out the

inconsistencies."  <u>Id.</u>

Beginning in 2008, Thompson sought treatment with Dr. Claude Curran.  The record

evidence includes Psychiatric Medication Management Notes that appear to be dated at various

points between 2008 and late 2009.  Docket #s 13 at 6; 23 at 4; <u>Tr.</u> at 289, 290, 323-326, 361,

362.  Dr. Curran's notes are largely illegible and of limited utility.  He did note a diagnosis of

bipolar disorder (noted as 296.89) on multiple occasions and also reported subjective findings of

depressed mood, anxiety and panic.  <u>Id.</u>

On October 8, 2008, Dr. R.G. Chahal, a nonexamining state agency psychiatrist who reviewed the record evidence, opined that Thompson suffered from the severe impairments of bipolar disorder and antisocial personality, but that these impairments were not of listing-level severity (see infra, at 9). Docket #23 at 4; Tr. at 293. Dr. Chahal indicated that Thompson experienced moderate restrictions in understanding, remembering and carrying out complex instructions, and in making judgments on complex work-related decisions. Tr. at 294. He found no limitations with respect to Thompson's ability to understand, remember or carry out simple instructions and no limitations with respect to Thompson's ability to make judgments on simple work-related decisions. Id. Dr. Chahal also indicated that Thompson is moderately limited in his ability to interact appropriately with the public, but mildly limited in interacting appropriately with supervisors, co-workers, and in responding appropriately to usual work situations and to changes in a routine work setting. Tr. at 295.

On March 31, 2009, Dr. Rothfarb completed a medical source statement of Thompson's ability to engage in work-related activities. Tr. at 315. He offered the opinion that Thompson had extreme limitations in understanding, remembering and carrying out complex instructions, as well as in making judgments on complex work-related decisions and in maintaining concentration for an extended period of time. Id. Further, he found that Thompson had marked limitations in interacting appropriately with the public, supervisors and co-workers, in responding appropriately to usual work situations and to changes in a routine work setting, and in maintaining socially appropriate behavior. Id. He also found that Thompson had mild limitations in carrying out simple instructions and in making judgments on simple work-related decisions, and had no limitations in understanding and remembering simple instructions. Id.

Finally, Thompson was found by Rothfarb to be markedly limited in activities of daily living and in maintaining social functioning, as well as extremely limited in maintaining concentration, persistence and pace. <u>Tr.</u> 317. Thompson represents that Dr. Rothfarb provided weekly supportive psychotherapy session, as reflected in records dated through December 2009 (see Docket #13 at 4), although Dr. Rothfarb's notes indicate that "[s]ince February 10, 2004 [when Thompson was originally seen for a Comprehensive Psychological Evaluation], incarceration, avoidance, phobic issues and significant difficulty adjusting to society have interfered with Thompson's treatment. He was not seen from 7/9/09 to 12/03/09." <u>Tr.</u> at 372. In that same note, Dr. Rothfarb summarized Thompson's condition as follows:

> Mr. Thompson is clearly a chronically and profoundly emotionally disturbed, mentally ill and mentally retarded man who has experienced psychotic symptoms in the context of a Major Depressive Disorder. He is unable to achieve, to maintain gainful employment or to understand himself. He is unable to tolerate distress and is behaviorally avoidant. Problems continue to be evidenced in his inability to relate to others, to regulate emotions, and to effectively participate in society outside a structured and regimented environment."

<u>Tr.</u> at 372-73.

Ultimately, Dr. Rothfarb commented that "expectations of behavioral changes must be muted by the reality of the past 36 years of this man's life. His prognosis is poor." <u>Tr.</u> at 373.

<u>Procedural History</u>

Thompson filed an application for SSI on May 7, 2007, alleging disability as of January 1, 1998, due to depression, mental illness, anxiety and headaches. Docket #23 at 2; <u>Tr.</u> at 84-97, 108. His application was denied. Docket # 23 at 2; <u>Tr.</u> at 48-49. On January 26, 2010, Thompson, represented by an attorney, testified at a hearing before Administrative Law Judge Sean P. Teehan (ALJ). <u>Id.</u> After confirming his education, work and incarceration history,

Thompson reported that he had taken a bus and a train to get to the hearing and that he "got lost trying to get here" ending "up at the wrong place four or five times." <u>Tr.</u> 35, 45, 46. Thompson testified that he was unable to work because of depression, nervousness, panic attacks whenever he was around people, sweating and shaking, being "scared all the time," difficulty reading, pronouncing words, poor understanding, memory problems, feeling "stressed out a lot," and feelings of paranoia. <u>Tr.</u> at 34, 41-44. He stated that he never left the house, which he shares with a roommate, except to attend doctors' appointments. <u>Tr.</u> at 34, 35, 37. Thompson testified that he had not seen Dr. Rothfarb in a while because he had been too depressed. <u>Tr.</u> at 35-36. He reported that "Dr. Rothfarb, I talk with" while Dr. Curran (whom Thompson also still sees) "helps [him] with meds." <u>Tr.</u> at 36-37.

In denying Thompson benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits. <u>Tr.</u> at 12-22; <u>See</u> 20 C.F.R. § 404.1520; <u>Goodermote v. Sec'y of Health & Human Servs.</u>, 690 F.2d 5, 6-7 (1st Cir. 1982). First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). The ALJ concluded that Thompson "has not engaged in substantial gainful activity since May 7, 2007, the application date." <u>Tr.</u> at 14.

At the second step, the ALJ must ask whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ determined that Thompson has three "severe" impairments: depression, anxiety and a personality disorder, which cause him "more than minimal functional limitations." <u>Tr.</u> at 14.

Third, the ALJ must determine whether the claimant has impairments that meet or are

medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations. 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ found that Thompson "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.929)." <u>Tr.</u> at 14. The ALJ specifically considered whether Thompson's mental impairments result in at least two of the following, satisfying the "paragraph B" criteria: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration. Ultimately, the ALJ found that Thompson has mild restrictions with respect to activities of daily living, and moderate difficulties in maintaining social functioning and concentration and that the "paragraph B" criteria were not satisfied. <u>Tr.</u> at 15-16.[2]

At the fourth step, the ALJ asks whether the claimant's impairment prevents him from performing the types of work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). At the fifth step, the ALJ asks whether the claimant's impairments prevent him from performing other work found in the national economy. <u>Id.</u> § 404.1520(a)(4)(v).

In assessing Thompson's residual functional capacity, the ALJ concluded that Thompson:

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can concentrate for up to two hours at a time during an eight hour workday; he can occasionally have superficial interactions with coworkers, supervisors, and the general public; he can understand and carry out simple two to three step instructions; and he can deal with

---

[2] As the ALJ noted, the limitations identified in the "paragraph B" criteria at the third step are not the residual functional capacity assessment conducted at steps four and five and which requires "a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorder listings in 12.00 of the Listing of Impairments (SSR 96-8p)." <u>Tr.</u> at 16.

routine changes in the workplace."

Tr. at 16.

In reaching this conclusion, the ALJ considered Thompson's statements, as well as the findings of Doctors Sokol, Yufit, Bard, Metcalf, Kobrin, Chahal and Curran, Tr. at 16-21. The ALJ credited and gave weight to certain of these doctors' findings, but rejected the opinion of Doctors Bard, Rothfarb and Kobrin that Thompson experiences "marked" mental functioning impairments in light of "the strong evidence of the claimant's malingering." Tr. at 20.

The ALJ noted that Thompson had last worked as a laborer for the City of Fall River in 1997, where his duties included cutting grass, driving garbage trucks, plowing snow, digging up streets and emptying garbage. Tr. at 21. The ALJ explained that, "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of his work as a laborer, I find that the claimant is able to perform it as actually and generally performed." Id. Moreover, "there are other jobs as mentioned by the FedRO, that exist in the national economy that he is also able to perform" and the ALJ further found that, "[i]n the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform." Id. The ALJ's ultimate conclusion was therefore that Thompson is "not disabled." Tr. at 22.

On July 9, 2010, the Decision Review Board sent notice to Thompson that it had not completed its review of the ALJ's decision during the allotted time period, and the ALJ's decision therefore became the final decision of the Commissioner and subject to judicial review. Tr. at 6. Thompson commenced this timely action for review pursuant to 42 U.S.C. § 405(g). Docket #1 at 2.

II.     DISCUSSION

Thompson argues that: (1) the ALJ's stated reasons for rejecting the opinion of Dr. Rothfarb are not based upon substantial evidence; (2) the ALJ's finding that Thompson retains the residual functional capacity to perform his past relevant work for the City of Fall River as a Laborer is not based upon substantial evidence; and, (3) the ALJ's alternative finding that Thompson can perform other work cannot be sustained absent vocational expert testimony. Docket # 13.

Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the Commissioner's decision (with or without remanding for rehearing) but the Court may not disturb the Commissioner's findings where they are supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.1981).  Determinations of credibility and the resolutions of conflicts in the evidence are for the Commissioner and not for the doctors or for court.  Id.  Although an administrative record might support multiple conclusions, a court must uphold the Commissioner's findings wherever a reasonable mind, reviewing the record as a whole could accept it as adequate to support them.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir.1991).  A denial of benefits, however, will not be upheld where there has been an error of law in the evaluation of the claim.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir.1996).  Similarly, a denial will not be upheld where the finding of the Commissioner is not supported by substantial evidence.  Id.

<u>The ALJ's Rejection of the Opinion of Dr. Rothfarb</u>

As noted above, the ALJ rejected the opinion of Doctors Rothfarb, Kobrin and Bard that the claimant had "marked" mental functioning impairments, in light of "the strong evidence of the claimant's malingering." <u>Tr.</u> at 20. Thompson argues that in finding Dr. Rothfarb's opinion "worthy of little weight as the findings are subject to error based on the claimant's lack of testing effort and malingering," the ALJ "substituted his own opinion for the medical evidence, which does not contain any definitive diagnosis of 'Malingering' as the ALJ found." Docket # 13 at 10.

Dr. Rothfarb's opinion is "not entitled to greater weight merely because [Dr. Rothfarb] was claimant's treating physician rather than a consulting physician." <u>Dudley v. Sec'y of Health & Human Servs.</u>, 816 F.2d 792, 793 (1st Cir.1987).

> "Generally, the ALJ should "give more weight to a source who has treated the claimant as a patient or examined the person ... because 'these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.' " <u>Monroe v. Barnhart</u>, 471 F.Supp.2d 203, 211 (D.Mass.2007) (quoting 20 C.F.R. § 404.1527(d)(2)). However, "[t]he law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians." <u>Arroyo v. Sec'y of Health & Human Servs.</u>, 932 F.2d 82, 89 (1st Cir.1991) (emphasis added). The ALJ may "downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where . . . it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." <u>Arruda v. Barnhart</u>, 314 F.Supp.2d 52, 72 (D.Mass.2004) (citing 20 C.F.R. §§ 404.1527(d)(2)-(4) & 416.927(d)(3)-(4)). "Although opinions from treating and examining physicians may be considered helpful, and in many cases controlling, the hearing officer is only required to make a decision that is supported by substantial evidence." <u>Monroe</u>, 471 F.Supp.2d at 211 (citing <u>Rodriguez</u>, 647 F.2d at 222–23). The ALJ may reject the opinion of the treating physician so long as an explanation is provided and the contrary finding is supported by substantial evidence. <u>See id.</u> Finally, the ALJ is "not required to accept the conclusions of claimant's treating physicians on the ultimate issue of disability." <u>Arroyo</u>, 932 F.2d at 89."

Shields v. Astrue, No. 10-10234-JGD, 2011 WL 1233105, at * 7 (D.Mass. Mar. 30, 2011) (Dein, M.J.).  Here, the ALJ explained his decision to give "little weight" to the opinion of Dr. Rothfarb, a treating physician, as follows.  The ALJ first detailed the opinion of Dr. Sokol, who saw the claimant in 2007 for a consultative mental evaluation.  Tr. at 17.  In particular, the ALJ noted that Dr. Sokol found "the claimant's demeanor to be uncooperative and evasive throughout the examination," that "the claimant was able to get himself to the evaluation appointment on time by bus and somehow find Dr. Sokol's office yet contend[ed] he could not answer any mental status examination questions," that Thompson scored 3/15 on the Rey Test of Malingering "which supported Dr. Sokol's assumption that the claimant's performance was not effortful," and that Dr. Sokol gave a diagnosis of "rule out malingering."[3]  Tr. at 17-18.  The ALJ found the opinion of Dr. Sokol to be "worthy of great weight as a neutral consultative evaluation. I find crucial to this unfavorable decision the strong evidence of the claimant's malingering which is devastating, on two fronts, to his credibility and ultimately to his claim."  Tr. at 18-19. The ALJ likewise assigned "great weight" to the 2007 opinion of Dr. Yufit (also a neutral consultative examiner) which was consistent with that of Dr. Sokol.  Tr. at 19.  Specifically, Dr. Yufit found after examining Thompson that the "patient interview does not indicate any significant depression" and he did not note any other significant mental health problems.  Tr. at 200.  The ALJ also highlighted the 2001 finding of Dr. Bard that during testing, Thompson "may have become careless or began to respond randomly," and that "the claimant seemed to have an inability or unwillingness to follow test instructions."  Tr. at 19.  Further, the ALJ noted

_____

[3] Dr. Sokol also administrated a Wechsler Memory Scale Test, which had to be discontinued because of the Plaintiff's "resistance to mental status examination as well as more formal testing."  Tr. at 218.

that Dr. Metcalf "called into question the validity of the claimant's [previous] low IQ scores" because of his lack of cooperation, combined with grossly intact cognitive skills, and with a foundation of strong evidence of malingering provided by the Rey Test for Malingering. <u>Tr.</u> at 19. This information led the ALJ to conclude that, "[s]adly, the evidence in this case, as discussed throughout this decision, including the claimant's statements and his testimony, all show how the claimant appears to grossly exaggerate his psychological symptoms above, perhaps motivated by the external incentive of obtaining financial compensation." <u>Tr.</u> at 18.

Thompson attaches significance to the fact that two state agency psychologists who reviewed the case after Dr. Sokol and who reviewed most of Dr. Rothfarb's records – Dr. Metcalf and Dr. Chahal – did not diagnose the claimant with malingering. Docket #13 at 14. Although Thompson is correct that Dr. Chahal did not explicitly diagnose malingering, Dr. Chahal nevertheless noted that Thompson had been "inconsistent in his reporting," had been "uncooperative with the Psych CE in 7/07," stated that "malingering was an issue and testing had to be suspended" and, ultimately concluded that "[u]ntil such time that [Thompson] cooperates with Psych testing, Dr. Sokol's estimate of his intelligence is accepted, since it is the most recent evaluation." <u>Tr.</u> at 293. Dr. Metcalf likewise noted that Thompson had "score[d] positively on malingering" with Dr. Sokol, which "calls into question the validity of the 2/4 evaluation [with Dr. Rothfarb] where he was seen as depressed with limited cognitive skills." <u>Tr.</u> at 235. Thompson correctly points out that Dr. Metcalf noted that there "are no current treaters to sort out the inconsistencies." Resolution of the inconsistency among the physicians' opinions, however, is a matter for the ALJ. <u>See</u> <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir.1981) (internal citations omitted)("In reviewing the record for substantial

evidence, we are to keep in mind that '[i]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary' . . . [t]he Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts . . . We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion").

Thus, substantial evidence in the record supports the ALJ's conclusion that Thompson "grossly exaggerate[s]" his psychological symptoms. The ALJ carefully reviewed Thompson's testimony, his interactions with the Social Security agency, the medical findings and the medical records. Tr. at 20  As a result of his review, the ALJ permissibly rejected the opinions of Dr. Bard, Dr. Kobrin, and Dr. Rothfarb, finding that their opinions "are all subject to past instances of malingering," essentially (as found by the ALJ) the gross exaggeration of symptoms by Thompson and his flawed credibility.

One additional issue bears mention and renders this case somewhat close. Dr. Sokol did not render a diagnosis of malingering, rather he gave a diagnosis of "rule out malingering." Tr. at 219. The ALJ noted this, but then referenced the DSM-IV definition of malingering before proceeding to reject Thompson's symptoms and certain treating physicians' opinions. Tr. at 18. The ALJ cannot render a medical diagnosis – he is simply not competent to do so. See Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.1999) (An ALJ is "not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion"). While the record plainly contains evidence of medical malingering as well as statements from doctors (chiefly Dr. Sokol)

identifying malingering as a possible diagnosis, nevertheless no doctor diagnosed Thompson as malingering, and thus it is not within the ALJ's authority to so diagnosis him. At most, a non-examining consulting doctor opined, after a record review, that various discrepancies combined with Dr. Sokol's findings "calls into question the validity" of Dr. Rothfarb's first evaluation. <u>Tr.</u> at 235.

The ALJ's quotation of the DSM's definition of malingering certainly could be read in context to suggest that the ALJ rendered an improper medical diagnosis. However, after carefully reviewing the decision, I reach the conclusion that the ALJ did something different. He rejected as "grossly exaggerated," based upon his review of the entire record, Thompson's statements concerning the severity of the symptoms he suffered as a result of his impairments. In this regard, he fairly found the opinions of the treating physicians to be inconsistent with other evidence in the record. Based upon the credible evidence in the record, he determined Thompson's residual functional capacity, a matter committed to his determination.

<u>The ALJ's Finding Regarding Residual Functional Capacity</u>

The ALJ determined that "in comparing the claimant's residual functional capacity with the physical and mental demands of his work as a laborer . . . the claimant is able to perform it as actually and generally performed." <u>Tr.</u> at 21. Thompson first argues that the ALJ "failed to properly consider the mental demands of Thompson's past relevant work as a laborer" because it is "uncertain how a city employee in any job could work with only occasional contact with co-workers as such work is typically not performed alone." Docket #13 at 16. Thompson has the burden of "making some reasonable threshold showing that [he] cannot return to [his] former employment because of [his] alleged disability." <u>Santiago v. Sec'y of Health & Human Servs.</u>,

944 F.2d 1, 5 (1st Cir.1991).  Notwithstanding his current representation that the claimant's relevant past work requires more than occasional contact with co-workers, Thompson cites to no such information in the record.

Second, Thompson argues that, "given the ALJ's finding that Thompson is limited to understanding and carrying out simple two to three step instructions, he would not, in fact, have been able to perform his semi-skilled work as a city maintenance worker as such work has a reasoning level of "3" and cannot be performed by an individual who is limited to carrying out simple two to three step instructions."  Docket #13 at 16-17.  Rather, asserts Thompson, according to the DOT, "reasoning level "3" jobs can be performed by an individual who can apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form."  Docket #13 at 17.

> "[T]he Social Security regulations and the DOT use markedly different standards for addressing a claimant's ability to understand, remember, and concentrate on job duties. The regulations divide such abilities into only two categories—"short and simple instructions" and "detailed" or "complex" ones—whereas the DOT uses a more graduated scale ranging from one to six that does not easily accommodate itself to the regulations' simple/complex dichotomy. Thus, no one-to-one parallel can be found between "simple" as it is used under the regulations and the DOT's requirements  .  .  .  "

Auger v. Astrue,  792 F.Supp.2d 92, 95-96 (D.Mass.2011) (quoting Thompkins v. Astrue, No. 09–C–1339, 2010 WL 5071193 (N.D.Ill. Dec. 6, 2010) (internal citations omitted)).  As Judge Ponsor explained in Augur, although there is a split of authority on this issue, "[t]he majority of federal district courts, including a court in this district, have followed the Seventh and Eighth Circuits" in concluding that "a job requiring level-three reasoning does not necessarily conflict with an RFC limited to simple and unskilled work."  Augur, supra at 96-97.  Here, the fact that Thompson's RFC was limited to carrying out simple two-to-three step instructions is therefore

not necessarily inconsistent with the ALJ's determination that Thompson could return to his past relevant work as a laborer.

Thompson next argues that given the ALJ's findings of his severe impairments of depression, anxiety and a personality disorder, the ALJ "should have elaborated regarding how these limitations are consistent with the performance of Thompson's past relevant work for the City of Fall River" given that the ALJ did not discuss the mental demands of the claimant's past work as required by SSR 82-62. Docket #13 at 19. Thompson argues that SSR 82-62 "is very explicit in requiring the ALJ to make specific findings of fact regarding 'the strength, endurance, manipulative ability, mental demands and other job requirements' of a claimant's past work." Docket #13 at 19. In the determination at step four,

"the claimant has the burden of making some reasonable threshold showing that [he] cannot return to [his] former employment because of [his] alleged disability . . . To do so, claimant must initially produce relevant evidence of the physical and mental demands of [his] prior work . . . That evidence may be testimonial or take the form of historical or subjective statements made in the application or other documents provided by the agency . . . but claimant must at least furnish some minimal information about the activities that [his] past usual work required, including those which can no longer be performed . . . The claimant must then describe those impairments or limitations which [he] says [he] has, see 20 C.F.R. § 404.1512, so as to raise the point to the Secretary . . . how current functional capacity, or, as here, capacity in the relevant period, precludes the performance of the particular prior job . . . In short, not only must the claimant lay the foundation as to what activities [his] former work entailed, but [he] must point out (unless obvious) – so as to put in issue – how [his] functional incapacity renders [him] unable to perform [his] former usual work."

Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st Cir.1991)(internal citations omitted). Thompson argues,

[t]here is certainly no evidence that an individual who can only '*occasionally* have superficial interactions with co-workers, supervisors, and the general public' [can] perform work cutting grass, driving garbage trucks, plowing snow, digging up streets, and emptying garbage, duties the ALJ noted in his decision. (Tr. 21). It is uncertain how a city employee in any job could work with only occasional contact

18

with co-workers as such work is typically not performed alone."

Docket #13 at 16 (emphasis in original).

Thompson points to nowhere in the record where he "raise[d] the point to the Secretary" that the mental demands of his prior work as a laborer could no longer be performed, instead arguing, apparently, that the ALJ should have made this inference based upon his own knowledge of a city employee's job.  Had Thompson raised the point, certainly the ALJ would have been required to address specifically the mental demands of the claimant's prior work.

> As noted in May, however, an ALJ may not simply rely upon 'the failure of the claimant to demonstrate [that] the physical and mental demands of her past relevant work' can no longer be met, but, 'once alerted by the record to the presence of an issue,' must develop the record further. May v. Bowen, 663 F.Supp. at 394. The problem here is that neither claimant's testimony nor the other evidence of record goes far enough to raise a meaningful issue as to her incapacity to perform her prior work.

Santiago, 944 F.2d  at 5-6.

The ALJ found that Thompson's past work required cutting grass, driving garbage trucks, plowing snow, digging up streets, and emptying garbage.  Tr. at 21.  Thompson informed Dr. Sokol that his past job involved cutting grass, and testified at the hearing that, as a municipal laborer, he emptied trash.  Tr. at 30, 216.  The ALJ's conclusion that "the claimant is able to perform his past relevant work in light of the physical and mental demands of that job" is supported by substantial evidence.

### The ALJ's Alternative Finding that Thompson Can Perform Other Work

The ALJ concluded, in the alternative, that "considering the claimant's age, education, work experience and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant can also perform."  Tr. at 21.  The ALJ

determined that a finding of "not disabled" is appropriate under Rule 204.00 of the Medical

Vocational Guidelines ("Grids") given that Thompson's nonexertional limitations "have little or

no effect on the occupational base of unskilled work at all exertional levels." Tr. at 22.

Ultimately, the ALJ stated, "[t]he claimant's limitation that I have included in his residual

functional capacity due to his moderate mental disorders have only a slight effect on the

occupational base.  This conclusion is supported by SSR 85-15." Tr. at 22.

Thompson argues that these findings are not based upon substantial evidence, and that

testimony of a vocational expert "was required to satisfy the Commissioner's burden of proof

due to the presence of nonexertional limitations of depression, anxiety and a personality

disorder."  Docket #13 at 19.

> "In cases where a nonexertional impairment 'significantly affects claimant's ability to perform the full range of jobs' he is otherwise exertionally capable of performing . . . the Secretary must carry his burden of proving the availability of jobs in the national economy by other means . . . typically through the use of a vocational expert. . . . On the other hand, should a nonexertional limitation be found to impose no significant restriction on the range of work a claimant is exertionally able to perform, reliance on the Grid remains appropriate."

> Ortiz v. Sec'y of Health & Human Servs.,  890 F.2d 520, 524 (1st Cir.1989)(internal

citations omitted).  Here, the ALJ found the claimant's nonexertional limitations "have little or

no effect on the occupational base of unskilled work at all exertional levels." Tr. at 22.

> "[S]o long as a nonexertional impairment is justifiably found to be substantially consistent with the performance of the full range of unskilled work, the Grid retains its relevance and the need for vocational testimony is obviated.  In the case of mental impairments, this inquiry actually entails two separate determinations: (1) whether a claimant can perform close to the full range of unskilled work, and (2) whether he can conform to the demands of a work setting, regardless of the skill level involved. As to the former, the Secretary has outlined the mental capabilities required for unskilled work as follows: 'The basic mental demands of competitive remunerative unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work

situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.' SSR 85-15, at 94. He has also emphasized that gauging an individual's 'capacity to do at least unskilled work . . . requires careful consideration of the assessment of RFC.' Id."

Ortiz, 890 F.2d at 526.

The medical evidence is adequate to support the ALJ's determination on this point and thus to obviate vocational expert testimony. See Id. at 525. The ALJ gave great weight to the opinion of Dr. Chahal regarding the claimant's mental limitations, and noted that Dr. Chahal found Thompson to be "moderately limited with complex instructions and with his ability to interact appropriately with the public," and also found Thompson's "ability to interact appropriately both, with supervisors, and with co-workers to be mildly impaired. The claimant's ability to respond appropriately to usual work situations, and to changes in a routine work setting, were both found by Dr. Chahal to be mildly impaired." Tr. at 20 (citing Tr. at 295). Moreover, the ALJ noted that Thompson's current treating psychiatrist, Dr. Curran, usually noted that the claimant was "good, and alert and oriented times three." Tr. 20-21. Although the evidence was not uniform on this point, given that other doctors opined to the contrary, there is no requirement of unanimity of medical opinion. This Court's review is to determine whether the ALJ's conclusion was supported by the medical evidence – which, in this case, it was.

III.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court AFFIRM the Commissioner's decision and that it ALLOW the Defendant's Motion for Order Affirming Decision of the Commissioner (Docket # 22) and DENY the Plaintiff's Motion for Order Reversing the Decision

of the Commissioner (Docket # 13).[4]


                                    /s / Leo T. Sorokin
                                    UNITED STATES MAGISTRATE JUDGE

---

[4] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).